The motion of the petitioner is therefore granted.

Petition granted.

An appeal to the general term, from the order entered upon the above decision, having been taken, the order was affirmed upon the foregoing opinion, December 1, 1879.*

———————

SIMON GUITERMAN, et al., Respondents, against THE LIVER-POOL, NEW YORK AND PHILADELPHIA MAIL STEAMSHIP COMPANY, Appellant.

(Decided November 3d, 1879.)

In an action to recover damages for injury to the plaintiffs' goods, in-trusted by them to the defendants as common carriers by sea, such injury having occurred while the goods were in a vessel ordinarily in charge of the defendants' servants, and under circumstances amounting, *prima facie*, to negligence on their part, the defense that at the particular time when the accident happened the vessel was, in consequence of a public regula-tion of the port, exclusively in charge of a licensed pilot, over whom the defendants had no control, and whose orders and directions the defend-ants' officers and servants were bound to obey, and that it was by his omission to direct what should have been done for the security of the vessel and cargo that the accident happened, is not available under a general denial in the answer, but should be specially pleaded. Such matter of defense is so peculiarly within the knowledge of the defendants that, to prevent surprise and to enable the parties to go to trial upon equal terms, the plaintiffs are entitled to be apprised of it by the answer.

————————————————————

* The order of the general term, entered on this decision, was affirmed by the court of appeals, March 2, 1880. (See 80 N. Y. 642.)

Guiterman *v.* Liverpool, &c. Steamship Co.

Where a motion to amend the answer by setting up such a defense is made at a second trial of the action, more than two years after the beginning of the litigation, the denial of such motion is not an improper exercise of discretion, and is not reviewable upon appeal.

An ocean steamship in the port of Liverpool, having a pilot on board, left her dock and anchored in the stream, according to the usual custom of the port, for the purpose of taking in coal for a voyage on which it was intended she should proceed upon the day following. While so at anchor, a part of the cargo sustained injury alleged to be due to want of care and attention on the part of those in charge of the vessel. *Held*, that the owners of the steamship were not relieved from liability for such injury, by the presence of the pilot on board, under the English statutes relating to pilotage in the port of Liverpool, as, under the statutory regulations applicable to that port, it was not, at the time when the injury occurred, obligatory upon the owners of the vessel to put her in charge of a pilot, and if the pilot was in charge by the voluntary act of the owners, they were answerable for any loss or injury arising from his negligence. Nor would the presence, even by compulsion, of the pilot on board, *prima facie* exonerate the owners from liability for an act of negligence in the management of the vessel ; they must show that the act of negligence was exclusively that of the pilot.

A question to a witness as to how the weather on a particular occasion compared with the weather at that season of the year, is objectionable as calling for an expression of his opinion.

In an action against common carriers for injury caused by their negligence to goods transported by them, the jury may properly include, as damages, interest on the amount or value of the goods injured.

In such an action, the jury were instructed that the price brought by the damaged goods at a sale by auction was not conclusive evidence of the value of the goods ; that it would be regarded as doubtful, if there were a more reliable estimate and appraisement ; that it was simply evidence of what the damaged goods were fairly worth, in the absence of any other evidence to control it. *Held*, that there was no error which was available to the defendants under a general exception.

APPEAL from a judgment of this court entered upon the verdict of a jury.

The action was brought to recover damages for injuries sustained by goods of the plaintiffs, while on board a steamship owned by the defendants, for the purpose of transportation. The facts are stated in the opinion. At the trial, the jury found for the plaintiffs,· and judgment for the plaintiffs was entered on the verdict. From this judgment the defendants appealed.

*Platt, Gerard & Bowers*, for appellants.

*Martin & Smith*, for respondents.

CHARLES P. DALY, Chief Justice.—The motion for a nonsuit was properly denied. The affirmative evidence given by the plaintiffs was amply sufficient to entitle the jury to pass uponthe question, whether the injury sustained was caused by the defendants' negligence.

There was no offer to prove that, by a local statute, applicable to the port of Liverpool, it was compulsory upon the defendants to place the steamer in charge of a pilot when she moved from the dock, and anchored in the river Mersey for the purpose of coaling; and that, by a general statute of Great Britain, the master or owner of a vessel is not answerable for any loss or damage to any person, occasioned by the fault or incapacity of any qualified pilot, acting in charge of a vessel, where the employment of a pilot was compulsory.

The counsel for the defendants simply proposed to read in evidence certain sections, from what purported to be a local and a general statute, which being objected to, was properly excluded by the court.

But if the existence of these statutes could have been proved, or the fact that it was compulsory, by the public regulations of the port of Liverpool, for the defendants to have a pilot on board of the steamer, whilst she was at anchor in the river, on the night preparatory to her departure, when the accident occurred, the judge held that the evidence could not be received, for the reason that it should have been set up specially in the answer, not being available as a defense, under a general denial.

It may be an open question whether it was necessary, if this constituted a defense, to plead it specially. In *Mitchell* v. *Crassweller* (13 Com. Bench, 237), which was an action for negligence, Chief Justice JERVIS thought that the plea of not guilty put in issue whether, at the time of the accident, the driver of the cart was the defendant's servant. Justice MAULE said that what was traversed by "not guilty" was whether the defendant, by his servant, negligently drove the

horse and cart against the plaintiff, and Justice CRESWELL was of opinion that the defendant, under "not guilty," might show that at the time of the accident, the driver was not acting as the defendant's servant; and it is a general rule, that any defense which shows that the plaintiff never had any cause of action against the defendant, may be given in evidence, under the general issue (*Wilt* v. *Ogden*, 13 Johns. 56; *Edson* v. *Weston*, 7 Cow. 278; *Clark* v. *Yale*, 12 Wend. 470; 1 Chitty's Pleadings, 538, 8th Am. ed.).

I am, however, inclined to think that the judge was right in holding that this defense should have been set up specially by the answer. It is also a general rule, that, where the act or omission would, at common law, *prima facie*, appear to be an act of negligence, and the facts in the declaration cannot be denied, any matter in excuse, or which shows that the act or omission arose from the exercise of a higher authority, over which the defendant had no control, must be set up specially as a defense (1 Chitty's Pleadings, 538, 6th Am. ed.; *Butterworth* v. *Soper*, 13 Johns. 443). The averment of the declaration here, is that the defendants, their master, mariners and servants, so carelessly, negligently and improperly carried the plaintiffs' goods, that they were injured. The three judges above mentioned, in *Mitchell* v. *Crassweller* (*supra*), were of opinion that an averment of this kind is put in issue by the plea of not guilty; but the case was determined upon another ground—that the defendant's servant, when the accident occurred, was not engaged in his master's business; whilst other cases, which will be referred to, hold, on the contrary, that in actions for negligence, the fact that the driver was not the defendant's servant, nor the horses or vehicle his, or that he was not the owner of the vessel that caused the collision, is not put in issue by the plea of not guilty, but only the wrongful act—that is, that the injury was caused by negligence.

The plaintiffs had intrusted their goods to the defendants. The vessel in which they were was ordinarily in charge of the defendants' officers and servants; and if they were injured from the want of proper care of the vessel whilst she was taking in coal on a rough night, it was *prima facie* the

Guiterman v. Liverpool, &c. Steamship Co.

negligence of the defendants (*Rodrigues* v. *Melhuish*, 10
Exch. 110; *Bennett* v. *Moita*, 7 Moore P. C. 160). The
defense that, at the particular time when the accident happened,
the steamer was, in consequence of a public regulation of the
port of Liverpool, exclusively in charge of a licensed pilot,
over whom the defendants had no control, and whose orders
and directions the defendants' officers and servants were bound
to obey; and that it was by his omission to direct what should
have been done for the security of the vessel and cargo, that
the accident happened, was a matter of defense so peculiarly
within the knowledge of the defendants, that, to prevent sur-
prise and to enable the parties to go to trial upon equal terms,
the plaintiffs were entitled, I think, to be apprised of it, by the
answer (*Demick* v. *Chapman*, 11 Johns. 132; *Ely* v. *Ehle*,
3 N. Y. 506; Co. Litt. 282).

It was held in *Taverner* v. *Little* (5 Bing. N. C. 678; 7
Scott, 796), that the defendant, under the plea of not guilty,
could not show that the cart was not his, nor driven by him,
or his servants, when the accident occurred; a case which Lord
DENMAN said (*Hart* v. *Crowley*, 12 Ad. & E. 378) was decided
upon great consideration. In *Hart* v. *Crowley* (*supra*), under
a like plea, it was held that the defendant could not show, that,
although the wagon by which the cabriolet was injured was
his, the horses and servant were not. In *Woolf* v. *Beard* (8
Carr. & P. 373, on appeal, 12 Ad. & El. 34; E. C. L. 92,
b), under the same plea, it was held, that the defendant could
not show that the cabriolet by which the plaintiff was knocked
down was not his; and in *Dunford* v. *Trattles* (12 Mees. &
W. 529), it was held that the plea of not guilty only puts in issue
the *wrongful* act, and that it was not necessary for the plaintiff
to show that the defendant was the owner of the vessel that
caused the collision. In *Lucey* v. *Ingram* (6 Mees. & W. 302)
and in *General Steam Navigation Co.* v. *British and Colonial
Steam Navigation Co.* (L. R. 3 Exch. 330), two leading
and important cases, where this defense of compulsory pilotage
was interposed and sustained, and in *Rodrigues* v. *Melhuish*
(10 Exch. 110), where it was relied upon, it was set up specially,
and the better opinion, I think, is that it should be.

The defendants proposed to amend their answer upon the trial, by setting up this defense, which being objected to, the judge denied their application. This was a matter of discretion, which is not reviewable upon appeal (*Hartfield* v. *Secor*, 1 Hilt. 535; *Barley* v. *Johnson*, 1 Daly, 61); or, if reviewable, the judge was right in denying the application. The defendants knew this fact when the action was brought, and after the cause had been in litigation more than ten years, it was a proper exercise of discretion to refuse to allow them to set up this defense for the first time, by amending their answer upon this, the second trial.

The judge refused it further, upon the ground that the existence of these statutes would constitute no defense to an action against the owners of the vessel, for an injury arising from negligence in the management of her, in which, I think, he was also right.

If the defendants had offered to, and could show that it was compulsory in Liverpool, when the vessel hauled out from the dock and was anchored in the stream for the purpose of coaling, to have a pilot on board, and that he had the exclusive charge and control of the vessel whilst she was coaling, it might be that he alone would be answerable for an injury for the want of proper care and diligence on his part in the management of her; that his taking exclusive charge and control of her being a matter of public regulation, the relation of master and servant between him and the owners could not then be assumed to exist, and that they would not be answerable for any injury from the want of skill or proper care and diligence on his part. Baron MARTIN, in *General Steam Navigation Co.* v. *British and Colonial Steam Navigation Co.* (L. R. 3 Exch. 320), said that a pilot taken compulsorily is not a servant of the ship-owner. He does not select him; and that, under such circumstances, the ship-owner would not be responsible for any, injury arising from the fault of the pilot, even at common law. This would probably be held to be the law in this State, where the movement of the vessel is under the exclusive control of the pilot, as she is, when he is carrying her into or out of a port (*Snell* v. *Rich*, 1 Johns. 305; *Smith*

v. *Condry*, 17 Pet. 20 ; 1 How. [U. S.] 28), though it is a point upon which the American authorities are by no means agreed (*Denison* v. *Seymour*, 9 Wend. 1 ; *Bussy* v. *Donaldson*, 4 Dallas, 206 ; *Yates* v. *Brown*, 8 Pick.. 23). But the question is not one which it is necessary in this case to decide, for nothing that was proved in this case or which the defendants offered to show, would warrant the conclusion as matter of law that the pilot had such exclusive charge of the steamer whilst she was lying at anchor in the river and taking in coal, as divested the owners, their officers, mariners and servants, from all control or interference with the management of the vessel, and made the pilot alone answerable for any injury to the vessel and cargo arising from negligence ; and upon the evidence received, so far as the defendants attempted to show this, it became a question of fact, under the evidence, for the jury.

In the examination of Mr. Inman, the manager, as I understand, of the steamships of the company to which the defendants steamship belonged, he said that in the port of Liverpool pilotage was compulsory ; that it was *his impression* that he did not employ Mr. Briggs (the pilot who was on board when the accident happened) ; that he was not his servant ; that he had taken the vessel in, and was entitled to take her out. The plaintiffs moved to strike out this portion of Mr. Inman's evidence, when his deposition was offered upon the trial ; and it was striken out by the judge, on the ground that it was mere matter of opinion on the part of the witness, and not proof of the facts ; and I think there can be no doubt of the correctness of this ruling. But even if this evidence was receivable it would not have shown that it was compulsory upon the defendants to put the vessel exclusively in charge of a pilot whilst she was at anchor in the harbor, to receive coal, on the eve of her departure. This would not follow from the witness's statement that in Liverpool pilotage was compulsory. Mr. Inman afterwards said : " I understand that the pilot is in full charge of the ship ; and the officers and crew are only responsible to obey his orders ;" and that he, Inman, thought that any disobedience of any proper order given by a pilot, of any kind, might throw the liability of damage upon the

owners.    Captain Briggs, the plaintiff's expert, however, testi-
fied on this point more decidedly and positively.   He said a
pilot was always on board a steamer when she was in the river,
and when asked if he has charge of the ship, he said, he has
charge under certain circumstances.   If the ship has to be
beached, or anything of the kind, the pilot would not do it
without the order of the captain.   The vessel would not get
under way, without the captain's order.   The pilot is merely
to look out that the ship swings right; if she does not, he
makes her swing right; but he would not move her anchor
without the order of the captain.   That the captain has
altogether to do with the ship; that he has the superior
authority; which is very different from the pilot having, in
such a case, the exclusive control and charge of the vessel.
The question therefore, upon this evidence, whether the pilot
had, or had not, when the vessel was anchored in the river,
exclusive control and charge of her, was a question for the de-
termination of the jury, upon which, it must be assumed, they
found for the plaintiffs.   What the pilot's relation to the ves-
sel really was under the circumstances, and how far he can be
regarded as solely responsible for the accident, will require a
reference to the evidence, which can be more conveniently
done after the examination of another question raised by the de-
fendants, which also involves an examination of the testimony.

  Upon the former trial of this cause, I thought it exceedingly
doubtful whether the defendants were liable upon the evi-
dence, but considered it better to allow the case to go to the
jury, than to determine so important a point against the
plaintiffs, upon the trial, as there would be a better opportunity
afterwards, when the voluminous evidence was printed, for a
full and more careful examination of it.   The general term,
after a full consideration of the testimony, were of opinion
that the verdict could not be sustained, and ordered a new trial.
Upon the new trial, however, several ship-masters were
examined by the plaintiffs, as experts, the effect of whose
evidence was that the accident could have been prevented if
there had been a proper exercise of care and diligence on the
part of those in charge of the defendant's vessel.   The intro-

duction of this evidence was objected to, and it was received under exception. It was objected to, 1st, that it was not proper to allow these witnesses to testify as to what should have been done under the circumstances, to avoid the accident; that the jury alone were to determine that upon the evidence; and that when all the facts were laid before them, they could judge what was the duty of the defendants, quite as well as the experts. 2d. That it was improper to read portions of the evidence to the experts, and to ask their opinion as to the proper conduct to be pursued, under the circumstances detailed.

The inquiry involved practical knowledge and skill in the management of steamships, lying in the stream, at anchor, in the port of Liverpool, whilst engaged, during rough weather, in taking coal, preparatory to their departure; a matter in respect to which it is not to be assumed that jurors have all the information and practical knowledge that is necessary to enable them to judge what should or should not have been done under the circumstances, to prevent injury to the vessel or cargo. The appellants claim in their points that it was one of those matters, upon which "the lay or uneducated mind was capable of forming a judgment," whilst several of their own witnesses, who were masters of steamships, were of opinion that none but those who were in charge of the vessel at the time could properly judge what it was best to do, under the circumstances. The opinion of nautical men, upon questions of this kind, was upheld by the Supreme Court of the United States, in *Transportation Line* v. *Hope* (95 Otto, 297). It was held in that case, that the captain of a tug-boat, familiar with Chesapeake Bay, might be asked if, with his experience, it would be safe or prudent on that bay or any other wide water, to tug three boats abreast, with a high wind. The witness, says Judge HUNT, delivering the opinion of the court, was an expert; and his knowledge and experience fairly entitled him to that position. It is permitted to ask questions of a witness of this class, which cannot be put to ordinary witnesses. It is not an objection, as is assumed, that he was asked a question involving the point to be decided by the jury. As an expert, he could probably aid the jury by such evidence,

although it would not be competent to be given by an ordinary witness. It is upon subjects on which the jury are not as able to judge for themselves, as is the witness, that an expert, as such, is expected to testify." These remarks, in a recent decision, and from a court of very high authority, are quoted, because they apply directly to the present case. The witnesses whose testimony was objected to by the defendants, were experts of the description here referred to. An enumeration of the qualifications of the first one called, Captain Britton, will suffice. He had followed the sea for forty years as a commander, and had commanded both sailing vessels and steamships. He was well acquainted with the port of Liverpool, having sailed in and out of that port the greater part of his life, and was perfectly familiar with its usages and customs. It was certainly competent for an experienced ship-master like this, after the facts were laid before him, to state or give his opinion as to what was the proper course to be pursued under the circumstances, by those in charge of the vessel, for the security of the ship and the preservation of the cargo from injury (*Moore* v. *Westervelt*, 9 Bosw. 558; *Id.*, 27 N. Y. 234). It was conceded and was beyond dispute that the accident was caused by the collier striking violently against the iron cover of the port-hole or dead-light of the steamer, which was wrenched off by the blow; so that the water flowed in through the open port to a height of six feet, in the fore compartment of the hold, before the accident was discovered and the ingress of the water arrested; whereby the cargo was greatly damaged; amongst which were the goods of the plaintiffs. Neither was there, when their witnesses were examined, any dispute or conflict as to the circumstances which preceded and led to the accident. They were narrated in the formal or official protest made before a notary by the master, officers and seamen of the defendant's steamship; and a more detailed account was given in depositions made by the second officer and the carpenter of the steamer, who were examined as witnesses. These depositions were read in the hearing of the experts called by the plaintiffs, and so much of the protest was read to them as described how the accident happened. The description of the

weather, the state of the tide, the position of the vessels with respect to each other, the roughness of the sea, the dragging of her anchor by the steamer, the surging or pitching and tossing of the vessels throughout the night, from the rough state of the weather, and the chafing and striking of the collier against the side of the steamer to which she was fastened, for the purpose of supplying the steamer with coal, preparatory to her departure, was substantially the same in the protest and in the depositions of the second officer and carpenter.

It is insisted that it was improper to ask the opinion of these experts simply upon their hearing the depositions referred to read on the trial, and upon the reading to them of a part of the protest. It is claimed that the proper course was to submit to them a state of facts hypothetically in the form of a question or questions, and then take their opinion upon the facts so submitted. Where there is conflict respecting the facts, before an expert is examined a statement of facts has to be submitted to him hypothetically; but where, as in this case, the facts were sworn to by the defendants' employees, who were officers and mariners of the steamer, and there was no contradiction or want of agreement between them as to what the facts were, it could make no practical difference, whether the facts were communicated to the experts, from the depositions, and that part of the protest which gavé an account of what happened, or by formulating them hypothetically in the shape of a series of questions. In either case the result would be the same; the opinion of the expert being given in either upon a positive state of facts submitted to him. The defendants, therefore have no right to complain, as the judgment of the experts was asked upon the uncontradicted statement of their own employees, of what occurred.

It was stated in the protest that at 7 P.M. on the day of the accident, they commenced coaling, with the collier alongside; that the wind was blowing very heavy, in squalls, and continued strong throughout the night, the collier alongside the steamer; that the tide running strong, raised "a nasty cross sea;" that they found that the steamer had dragged her anchor, and that they veered out to ninety-five fathoms, but she did not come up

until off Egremount, a mile or more distant, the collier alongside all the time, working against and chafing the side of the steamer; that at *midnight there were strong winds,* and that at 6 A.M. the wind shifted to the northward, and at 10 A.M., the vessel being more by the head than usual, the pumps were sounded, and it was found that there was six feet of water in the fore compartment; and that they—the master, officers and men, who signed the protest—believed that the damage was occasioned by the collier, in the cross sea, whilst the steamer was dragging her anchor, or afterwards, striking against the deadlight violently, and so causing the leak.

The second officer stated in his deposition, that on the night of the accident there were strong breezes with hard squalls from the southwest, through the night; that early in the morning the wind shifted to the northwest, and that the tide running down against the wind, caused a heavy cross-sea swell in the river, which made the collier heave, rise and fall, and roll against the side of the steamer; and that this rolling, rising and falling, continued from midnight until the leak was discovered, which was after 8 o'clock in the morning; that the wind, with the weight of the collier fastened alongside, caused the steamer to drag her anchor, between night and morning. He also stated that he did not go to sleep, because the weather was too wild. The carpenter deposed that it was very rough weather; that the effect of the weather on the collier and the steamship was very heavy surging; that is, as he described it, "the two ships jumping up and down;" that the collier thumped, and that the surging and jumping described was pretty heavy.

It was upon this state of facts that these experts were asked what, in their opinion, was the proper course of conduct, for the persons in charge of the steamship. Captain Britton answered, that when the ship commenced driving, it was to cast off the collier and get up steam. He also said that in the harbor of Liverpool, where the anchorage was generally very bad, it was a proper precaution, at that period of the year, the winter season, in stormy weather, to keep the steam up; so that if the vessel dragged her anchor she could be easily moved,

Guiterman *v.* Liverpool, &c. Steamship Co.

there being no difficulty then in getting her back to the point from which she dragged the anchor. And upon his cross-examination, he answered affirmatively the question, "you would really want to be there yourself to judge accurately what you ought to do in the premises?" Captain Briggs answered that he would have kept up steam on the steamship if she began to drag; that it would have kept her in her place in smooth water; that there was no necessity for her dragging down; that she could have been kept in the position where she was with an anchor of seventy-five fathoms of chain. He was then asked: "suppose that, notwithstanding, she did drag with the weight of the collier?" and he replied: "Then I would cast the collier off at once, if I could not hold her with steam and an anchor." Upon being further asked what would be the duty of those on board, when the collier was found to be beating and chafing against the side of the steamer; he replied that he would put (out) long fenders;—long spar or hoop-pole fenders, that would have kept any vessel off; and that, when they found the wind had changed, with the collier alongside, they should have got under way, and gone up to the Sloine, where the water was smooth, and the river wide; or else, cast off the collier; as a collier of that size was able to take care of herself; and Captain Hilton was of opinion that, under the circumstances, as detailed in the protest and in the depositions of the second officer and the carpenter, those in charge of the steamer should have cast off the collier. The like question having been put to Captain Bordua, he answered that he would have cast off the collier, as he had done in a similar case himself. The answer of Captain Crowell, who had been a master of a vessel for twenty-seven years, and had commanded both sailing vessels and steamers, was to the like effect; that he would have cast off the collier. Captain Briggs testified also that when a collier comes alongside, it is always usual to put out fenders, and that if the fenders are all right, and looked after, the collier never could touch the side of the vessel. And one of the experts called by the defendants, Captain Grace, whilst testifying that it should be left to those on board to determine what it was best to do under the circumstances

—that they would be the best judges; yet, when narrowed down on the cross-examination to the question, what he would have done under the circumstances detailed in the depositions before referred to ? answered that he " should say let go the vessel ;" but followed it up afterwards, upon the direct, by saying that he would leave it to the judgment of those on board, because some might judge it dangerous, whilst others would not.

It was insisted on the trial, as it is also upon the argument of this appeal, that the facts stated to those witnesses were too uncertain, to form a basis, as I understand the objection, for the judgment or opinion of the witnesses as experts. The experts themselves, who were experienced nautical men, did not think so. They regarded them as sufficient to form and express a very decided opinion as to what ought to have been done, and which, it appears, was not done, for the security of the vessel and cargo. Our attention is called to an observation of Lord CAMPBELL, " that experts come with such a bias upon their minds to support the cause in which they are embarked, that hardly any weight should be given to their evidence." It is unnecessary to comment upon this general and very sweeping remark, which may have had point in the case in which it was applied (*The Tracy Peerage Case,* 10 Clark Finnelly, 191), for the question before us is the admissibility of this evidence, and not the weight to be attached to it, which was for the jury ; and that it was admissible, I do not entertain the slightest doubt.

The fact that there was a pilot on board, in charge of the vessel, neither prevented nor relieved the officers of the ship from taking such precautionary measures as were necessary to keep the collier from chafing and striking against the side of the steamer, through the night. The master was not on board. It was not, according to the testimony of Mr. Inman, customary in that port for the master to remain on board, whilst the steamer was anchored in the stream, preparatory to her departure; but " the first officer," says Mr. Inman, " always relieves the captain." The first officer, however, did not do so upon this occasion. It was the annual festival of Christmas, and he went ashore in the evening, and returned to the steamer

about seven or eight o'clock the following morning. The second, third, and fourth officers were on board, and the fact that the vessel was leaking was not discovered until the first officer returned in the morning. When he returned, the weather, as he says, was still rather stormy; and when he came to examine to see if everything was right, as he had left it, his attention was called to the fact that the ship was down at the head a little more than she ought to be; and upon examining into the cause it was found that the vessel was leaking, and that there was six feet of water in the fore compartment. The pilot testified that he did not stay on deck all night; that he was on the deck nearly all the time until twelve or one o'clock, and up and down during the night, as the pilots always are on the river. He testified that when the coaling commenced, which it appears continued all night, there was nothing in the condition of the weather, or the river, which made it unsafe to go on with the coaling, and that the condition of things did not alter during the night; that the wind veered around a little; that the wind was blowing a *moderate* breeze all night, and did not increase; that he did not observe any surging of the collier alongside the steamer, more than is usual on such occasions; that they always do surge and rock a little; that if he had thought there would have been any danger, he would have ordered the collier away, as it was his duty to do; that the steamer had cork fenders, and the collier, hay fenders; that there were cork fenders forward and abaft, on the side of the steamer when the collier was coming up, and when she was alongside, these cork fenders were taken up, there being three large hay fenders on the side of the collier, one forward, one amidship, and one aft. The pilot does not seem to have seen the very heavy surging of the collier against the steamer, which the second officer and the carpenter saw, which may very well have been, as, according to the protest, it was at *midnight* that there "was very strong winds," and when Pottenger, one of the defendant's witnesses, came on deck at six in the morning it was, he said, "blowing *very strong*; the collier and steamer *pitched* a *good deal*; it was pretty heavy," and that he "observed considerable *thumping* against the side where

the collier was." The pilot's idea of a "moderate breeze" was very different from the second officer and carpenter's description of "strong breezes and hard squalls through the night," a state of the weather "too wild" for the second officer to go to sleep; and even the first officer, who was on shore, says "it was rather wild weather, unsettled; a nasty cross sea; that the wind was unsteady and blowing strong"—something very different from a moderate breeze.

When the pilot was below, which it appears he was after one o'clock, except coming occasionally afterwards upon deck, it is to be assumed that the vessel was in charge of some one or more of the subordinate officers; or upon such a night, and under such circumstances, she should have been; and from the quantity of water found when the leak was discovered, the accident must have occurred after midnight, or in the early hours of the morning. As there was, from the statement of the carpenter, a very heavy surging of the two vessels, with the collier thumping against the side of the steamer, it was not necessary to consult the pilot as to the propriety of putting out fenders—long spars that hang down nearly from the water's edge, up to within a few feet of the vessel's side—which, according to Captain Briggs, is the usual precaution taken to prevent the vessels from chafing or striking against each other; or as to the propriety of having steam up on such a night, to avert any injurious effect, if the steamer should drag her anchor; or as to casting off the collier, when, from the state of the wind and the sea, she was striking heavily against the sides of the steamer, and it was not otherwise possible to prevent it. The defendants' carpenter was asked what would be the effect of this rubbing, beating and surging of the loaded collier against the outside plate of the steamer, in such a sea, and he answered that it would not have a very good effect. Captain Britton, the plaintiffs' expert, said that it could not but injure the steamship; that it would start the rivets; and that if the collier struck the dead-lights, it would injure or break them; and Bryan, one of the defendants' witnesses, testified, that if there was a tender alongside *rubbing* and *bumping*, it would break the port and the side of the ship.

Guiterman *v.* Liverpool, &c. Steamship Co.

But no further precautionary measures were taken, and the result was, that a dead-light was wrenched off by a heavy blow from the collier, and the water flowing in to a height of six feet, a large amount of the cargo was damaged. The statement of the defendants' experts, that those on board were best able to judge what ought to be done, and that it should be left to them to exercise their best judgment, may be true; but it does not follow from this, that upon this particular occasion, those in charge of the City of Baltimore were carefully diligent. They certainly were not, if, as the evidence of the plaintiffs' experts shows, the accident could have been easily avoided by doing what these witnesses declared should have been done; and the occurrence of an accident so serious in its consequences, coupled with the omission to take the precautionary measures pointed out by the experts, would warrant the conclusion, at which the jury must have arrived, that there was inattention, and a want of due care and diligence.

In the case of *Roderigues* v. *Melhuish*, 10 Exch. 110, a case in many respects analogous to this, the question was examined how far the local act applicable to the harbor of Liverpool made it compulsory in that harbor, where a vessel is lying at anchor in the stream, to have a pilot on board. In that case, as in this, the vessel was at anchor in the harbor of Liverpool, being under orders to proceed to sea on the following day, and had a pilot on board. Riggers were employed in completing her rigging—vessels in that port being unable to complete their rigging until they have left the docks. She had lost her anchor in the crowded part of the harbor, as she was passing out of the docks, and the plaintiff was the owner of an anchor boat which was engaged to raise it, and whilst it was so employed, his boat, in some way, was swamped by the vessel. It was not compulsory under the local act to have a pilot on board, unless the vessel was "proceeding to sea;" and it was held that she was not, as her rigging was not complete when the accident occurred, and she was not to sail until the following day. The court held that, under these circumstances, she was not ready to proceed to sea, that "she might have refused to take a pilot on board whilst she was thus in the river,

and was under no obligation to take one at that time;" and it had previously been held in *The Maria*, 1 Wm. Rob. 105, that where a vessel is at anchor, in the port of Liverpool, the taking of a pilot on board is optional with the master. The act which the defendants' counsel wanted to read, was an act consolidating previous acts relating to the harbor of Liverpool, which was passed after this decision in *Roderigues* v. *Melhuish* was rendered; but the provisions of the consolidated act, in this respect, I infer, were the same, from the defendants' counsel's statement that it was his impression that until the steamer was ready to sail, she was not in charge of the pilot, within the meaning of the section which he asked to read; so that the decision in *Roderigues* v. *Melhuish* is equally applicable to the act, or section of the act, which the defendants wanted to give in evidence. The defendants' steamer, like the vessel in that case, was not ready to go to sea when the accident happened, for she was taking in coal, and was not to sail until the following day; so that, according to this decision, it was not, under the statutory regulations applicable to the port of Liverpool, obligatory upon the defendants to put her in charge of a pilot when the injury occurred, and it is well settled that, if the pilot is in charge by the voluntary act of the owner, he is the servant of the owner, and the owner is answerable for any loss or injury arising from his negligence. *The Montreal*, 17 Jur. 538; *The Stettin*, 1 Brow. & Lush, 199, 203; 31 L. J. (P. D. & Ad.), 208; *The Lion*, L. R. 2 Adm. 102; *Denison* v. *Seymour*, 9 Wend. 1; *Shaw* v. *Reed*, 9 Watts & S. 72; Shearman & Redfield on Negligence, 81 a (2 ed). It was also held in the case of *Roderigues* v. *Melhuish*, that the presence even of the pilot on board the vessel, by *compulsion*, does not, *prima facie*, exonerate the owners from responsibility for an act of negligence in the management of the vessel; but that they are bound to show that the act of negligence was *exclusively* that of the pilot.

In *Smith* v. *Condrey*, 17 Pet. 20; 1 How. [U. S.] 28, it was also held, that, to discharge the owner, it must appear that the accident was the fault of the pilot *alone*, and that if it was altogether, *or in part*, caused by the negligence, unskillful-

Guiterman *v.* Liverpool, &c. Steamship Co.

ness or misconduct of the officers or mariners, the owners are liable.

In *The Queens*, L. R. 2 Adm. 354, a case of collision in which the vessel was in charge of a pilot by compulsion of law, it was held that as the collision was not caused by the incapacity or error of the pilot *alone*, but by the want of assistance in the discharge of his functions, which he had a right to expect from the crew, in keeping a proper lookout, the owners were liable; for, although a pilot may be on board by compulsion of law, the owners are, in all cases, liable for the negligence of the master, officers or mariners (*The Protector*, 1 C. Rob. 45; *The Diana*, 1 Wm. Rob. 131).

The superintending of the coaling of the steamer, and the doing of what was essential whilst she was receiving coal with the collier fastened alongside, to prevent injury to her from the collier striking against her side on that rough night, was more particularly the duty of the regular officers of the ship, than of the pilot. It was not necessarily connected with pilotage, as the vessel was at anchor, and was not to start upon her voyage until the following day. To hold, under these circumstances, that the accident was owing *exclusively* to the negligence of the pilot, would, in my judgment, be unwarrantable. In *The Bark Lotty* (Olcott, 329), it was held that the master was liable for an injury, arising in a gale of wind, from the vessel being imperfectly fastened to the wharf, although the vessel was moored at the wharf under the direction of a licensed pilot, which was an act certainly more connected with pilotage than the coaling of a steamer before her departure. But even if the steamer had been placed solely under the charge of the pilot, as the defendants were under no compulsion to do so, they would be answerable, if it was from his negligence that the accident happened; so that in no view of this branch of the case—in the testimony given, or in what the defendants wanted to give in evidence—was there anything that would relieve the defendants from responsibility for an injury to the plaintiff's goods from negligence.

The remaining questions raised upon the appeal may be summarily disposed of. The question put to the shipwright

Cruikshank, " Do you recollect how the weather on that occasion compared with the weather at that season of the year, as to its being rougher or more stormy than usual?" was objected to, as calling for the opinion of the witness, and was excluded under the defendants' exception.    It certainly did call for the expression of the opinion of the witness.   He was required to draw a conclusion and  give his opinion as to how it compared with the weather at that season of the year.   Its exclusion, moreover, if admissible, could have done the defendants no injury, the witness having immediately before testified that " on the night of the accident it was no rougher *than usual*, when vessels coal in the river."   The rule of damages laid down by the judge was the correct one (*Sturgess* v. *Bissell*, 46 N. Y. 462; *Black* v. *Camden, &c. R. R. Co.*, 45 Barb. 40); and the jury were entitled to allow interest on the amount or value of the goods injured as damages (*Parrott* v. *Knickerbocker, &c. Co.*, 46 N. Y. 361; *Sedgwick on Damages*, 385, and cases there cited).   The two exceptions to this ruling, therefore, were not well taken.

The judge did not, as alleged in the appellant's ninth point, instruct the jury, that by giving a notice of sale at public auction, the price at auction, under such a sale, would bind the defendants.   Whatever the judge may have said in his charge, which was by no means as broad as this, he afterwards charged at the defendants' request, that the sale at auction was not conclusive evidence of the damaged value of the goods, and added that he would regard it as doubtful if there were a more reliable estimate and appraisement; that it was simply evidence of what the damaged goods were fairly worth in the absence of any other evidence to control it.   To this the defendants excepted, and I see nothing in the exception.   The first proposition which the defendants requested the judge to charge was untenable.   It was conceded that the accident was a river peril, which was one of the perils excepted in the bill of lading, and for which the defendants were not liable, unless the accident was caused by negligence on their part.   The law upon this point is well settled, and the defendants were not entitled to a verdict if there was negligence, because the injury arose from

Guiterman *v.* Liverpool, &c. Steamship Co.

one of the excepted perils. The court charged the second proposition submitted by the defendants, and what the judge said in doing so was not any qualification, but an affirmation of it. It was substantially that the plaintiffs had to establish by a fair preponderance of testimony that the accident occurred or was contributed to in an essential degree by the defendants, which, in connection with what the judge laid down in his charge, meant by the defendants' negligence. To this an exception was taken, and I see no ground for it.

The same remark applies to the judge's qualification of the defendants' fourth proposition. What the judge said was fully borne out by the evidence; that there was no affirmative proof in the case, that the injury to the plaintiffs' goods accrued from any other cause than the water that flowed into the vessel through the port-hole after the iron cover of it was wrenched off. The seventh proposition, refused by the judge, relates to the vessel being in charge of a licensed pilot, upon which I have already sufficiently expressed my views. It suffices, therefore, to say, that it was properly refused, as was also the eighth proposition, the rule of damages laid down by the judge being the correct one. The last request, that the court had no jurisdiction of the action, is disposed of by the decision of the court of appeals in *Dougan* v. *The Champlain Transportation Co.*, (56 N. Y. 1).

There are some other exceptions in the case, but as they were not discussed on the argument, and are not mentioned in the appellants' points, it is to be assumed that they are not relied upon.

The judgment should be affirmed.

VAN HOESEN, J., concurred.

Judgment affirmed.*

* The judgment entered upon this decision was reversed upon appeal to the court of appeals, January 18, 1881, for error in the admission of evidence not given upon a state of facts put hypothetically, and not affecting the points stated in the foregoing syllabus